## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 11-20678-CR-MOORE/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

ROBERT DAVIS,  ERIC HANNA,
TREVOR RANSFER, and KENDRICK LOWE,

      Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

This matter is before the Court on four motions to suppress evidence filed by

Defendants Robert Davis [D.E. 57], Eric Hanna [D.E. 58], Trevor Ransfer [D.E. 59] and

Kendrick Lowe [D.E. 62].  The Court has reviewed the motions and the Government's

responses [D.E. 64, 65, 66, 67]; the Defendants did not file replies.  The Court held a

three day evidentiary hearing regarding these motions on December 20, 21 and 28,

2011, at which the Parties presented arguments. [D.E. 99, 100, 110].  Thereafter,

several Parties filed supplemental memoranda/closing arguments, which the Court

also reviewed. [D.E. 105, 106, 107, 108].  For the following reasons, the motions should

be **DENIED**.

### I.  BACKGROUND

On September 29, 2011, Defendants were charged in a multi-count indictment

relating to a series of robberies. [D.E. 3].  Defendants move to suppress either their

post-arrest statements or objects recovered during a purported illegal search, or both depending on the specific Defendant.

Defendant Robert Davis contends that the physical evidence recovered from his residence ought to be suppressed because law enforcement officers "conducted a warrantless search of [his] home ... in violation of [his] Fourth Amendment rights." [D.E. 57]. Each Defendant also moves to suppress their post-arrest statements because they were procured in violation of their Fifth Amendment rights when, during custodial interrogations, the Defendants were allegedly kept incommunicado, deprived of food and sleep, physically abused and coerced into providing these inculpatory statements.

## II.   FINDINGS OF FACT

Beginning in April 2011, Miami-Dade robbery detectives discovered similarities involving numerous commercial robberies occurring in the Miami-Dade area.  In each of these robberies, the armed robbers would enter the store wearing similar style clothing, take over the store and then rob both the store and the individual customers. The surveillance videos and victim descriptions of these robberies revealed that the robbers were slim, black males who wore the same (or similar) identifiable clothing during each robbery.

On April 16, 2011, a Family Dollar store was robbed in Miami.  Matching their *modus operandi*, the robbers wore similar clothing, struck at a similar time, carried firearms and quickly robbed the store.  Law enforcement recovered a palm print from this robbery and matched it to Khambrel Bynum ("Bynum").  Detectives interviewed

2

Bynum, who was already in custody for an unrelated robbery, and he admitted his involvement in this robbery. He agreed to cooperate with detectives and provided interviews on May 19 and 20, 2011.

During these interviews, Bynum identified Defendant Robert Davis ("Davis") as the leader of a robbery crew in the Miami area. Bynum identified other members of Davis' robbery crew, which he was a former member of, as Davis' co-defendants in this case: Montavis Middleton, Fabian Warren, Trevor Ransfer ("Ransfer"), Eric Hanna ("Hanna") and Kendrick Lowe ("Lowe"). *See* [D.E. 99 at 9-10]. Bynum admitted he committed the Family Dollar store robbery with Davis, Middleton, and Warren.

Bynum continued to cooperate with law enforcement and provided them with additional information about Davis' robbery crew. Bynum identified the cell phone numbers of the individual members of Davis' robbery crew, including Davis. Davis' cell phone records indicated that his cell phone was present at several of the robberies his crew was suspected of committing, at the exact time each of the robberies occurred. Bynum also indicated that at many of the robberies they used Middleton's white Ford Expedition as the getaway vehicle, which was consistent with information gathered by law enforcement.

Utilizing the contact information for each member of Davis' robbery crew, law enforcement began surveiling them. In particular, after observing Middleton operate his white Ford Expedition, officers placed a tracking device on the vehicle to aid in their surveillance. Through Bynum, law enforcement also learned the location of Davis' and Middleton's residence.

3

On May 27, 2011, Bynum made a controlled call to Davis that law enforcement recorded.  During the call, Davis stated that his crew was preparing to commit another robbery, but they needed to steal another getaway vehicle first (which was a standard procedure).  Law enforcement continued to observe Davis' robbery crew and waited for the next robbery to occur.

### A.   *Wendy's Robbery and Defendants' Arrest*

On June 1, 2011, at approximately 10:05 p.m., the Wendy's restaurant located at 13901 South Dixie Highway was robbed at gunpoint by a group of individuals matching the *modus operandi* of Davis' robbery crew.  The robbers stole money and property from the Wendy's store, its employees and customers.  The robbers were seen leaving the Wendy's in two vehicles, a blue minivan[1] and a small white car.  Suspecting Davis's robbery crew, law enforcement responded to the location of Middleton's Expedition by utilizing the tracker.  At approximately 10:30 p.m., officers discovered the Expedition being closely followed by a small white car, which matched the description of one of the vehicles involved in the Wendy's robbery.  Both vehicles were occupied by black males matching the general description of the Wendy's robbers.

Law enforcement followed the two vehicles into a gas station, at which point the vehicles and occupants were detained.  Inside the Expedition were Hanna and Ransfer.  Inside the white Toyota Solara were Ms. Ronisha Davis (Davis' sister) and Middleton.

---

[1]     After the robbery, detectives learned that a blue minivan was stolen earlier that day from a residence one block away from Middleton's residence.  Also, detectives previously learned that Davis' sister owned a small white vehicle.

4

Law enforcement recovered cash and the Wendy's manager's stolen ATM card. The two vehicles were impounded while search warrants were obtained.[2]

After identifying three members of Davis' robbery crew (Middleton, Ransfer, and Hanna), law enforcement responded to Davis' residence in search of the stolen blue minivan and additional suspects. Detective Corey Thomas ("Thomas"), who was the first officer to arrive at Davis' residence, provided reconnaissance. He reported observing a blue minivan matching the description of the getaway vehicle parked a few houses away. He also reported observing three individuals (two wearing white shirts, dark pants and a third wearing all dark clothes) located on Davis' porch. While this description did not precisely match the pending BOLO,[3] Det. Thomas was able to positively identify Davis because they previously had a traffic-related encounter.

Based on this information, additional officers arrived in the area and waited at a nearby park before Det. Thomas directed them to Davis' residence. Of these additional officers, Detective Jaime Ramirez ("Ramirez") was one of the first (if not the first) officer to arrive on scene. Det. Ramirez parked his vehicle one house west of

---

[2]     After the search warrants were executed, law enforcement discovered the driver's licenses and credit cards of victims from some of the other charged robberies in this case. Also discovered were the clothing used by the Davis crew in committing the other robberies.

[3]     The BOLO was announced over the radio as follows: "subject one ... white hoodie ... looked like Abercrombie stitching across the front ... blue or black shorts ... about five-six, five-seven a hundred forty, hundred fifty pounds, he had white Jordans on. Second dude, dark black hoodie with white shirt covering his face, five-eight to five-nine, same weight frame as the other guy also with a semi-auto and they're saying that there was possibly two other guys outside of the store that were securing it." *See* Government Ex. 54.

Davis' residence, walked towards the suspects, announced himself as "Police" and commanded them to stop.[4]  Davis and Lowe immediately turned to run, refusing to obey these orders.  Det. Ramirez and others pursued them into Davis' residence.  Because the front door was locked behind the fleeing suspects, Det. Ramirez was forced to kick down that door and chase them into an interior bedroom.

After a brief struggle with Lowe,[5] officers apprehended the two suspects and placed them into custody.  Inside that same bedroom, officers observed in plain view two handguns sitting on top of the bed.  While securing the residence, the officers noticed a suspected assault type rifle and another black rifle in plain view.  The residence was then secured and a search warrant obtained prior to the seizure of any items from the residence.   According to a contemporaneously recorded radio

---

[4]     Notably, however, Det. Ramirez testified that Davis and Lowe were wearing dark sweatshirts as opposed to white shirts and dark pants, as Det. Thomas testified.  This discrepancy is discussed in further detail below. *See* III.A.

[5]     Detective Armenteros sustained an injury during this struggle, which drew blood. *See* Government Ex. 53.  In a contemporaneous photograph, Lowe is seen wearing a white t-shirt with a red discoloration on the collar that he asserts is Det. Armenteros' blood. *See* Lowed Ex. 2.  Lowe raises these photographs to rebut that probable cause existed for his arrest (i.e., mis-matched description; resisting arrest). Regardless of the BOLO or Lowe's purported resistence, the Court concludes that ample probable cause existed to arrest him at Davis' residence on June 1, 2011 for his suspected involvement in the Wendy's robbery.  Moreover, even assuming it was material (which it is not), the evidence before the Court is insufficient to establish whether Lowe or another officer caused Det. Armenteros' injury.

6

transmission, Davis and Lowe were arrested between approximately 11:51 p.m. and 11:55 p.m. *See* Davis Ex. 6.[6]

### B.   Interviews of Five Defendants and Ronisha Davis

The five defendants and Ronisha Davis were transported to the Miami-Dade robbery bureau office for interviews.  The Defendants arrived at the robbery office between 12:00 a.m. and 2:00 a.m. on June 2, 2011.  At that time, all five defendants, along with Ms. Ronisha Davis, were provided with meals from McDonald's. [D.E. 99 at 142].[7]  Detectives then began interviewing the five defendants and Ms. Davis individually.  Since Davis was the leader of the robbery crew, detectives interviewed him last.  During their interviews, detectives discovered that Davis' robbery crew had committed many more robberies than they first suspected.  As each co-defendant began admitting to other robberies and implicating Davis in them, the detectives would notify the lead detectives from the respective robberies and have them respond to the station. At approximately 11:50 a.m., the search warrant referenced above was executed at Davis' residence.  The Defendants remained in separate interview rooms while the

---

[6]    This radio transmission includes a time-stamp indicating the start (6/1/2011, 11:30:22 p.m.) and finish (6/2/2011, 12:20:44 a.m.) of the recording.  Because the time stamps match the total duration of audio, the Court can estimate the actual time when certain events on the recording occurred.   While not specifically authenticated (and entered into evidence as a demonstrative aid), neither side objected to the use of this recording.  As such, the Court will treat it as a fair indication of that period, at least to the extent the audio supports a specific factual finding.

[7]    As noted below, detectives also provided the Defendants beverages, doughnuts, and pizza during the 24-hour interview process.

detectives gathered information about all of the implicated robberies.   The interviews lasted for approximately 24 hours.

Hanna.   He provided two recorded interviews.   Prior to his first interview, Hanna executed a written *Miranda* waiver form at 8:30 a.m. [D.E. 65-2].   During his 9:21 a.m. recorded interview, Hanna orally reviewed and acknowledged his written *Miranda* waiver. [D.E. 65-1 at 4].   He also acknowledged that his statements were made voluntarily, without threats, coercion or improper promises.  *Id.* at 2-5. Thereafter, he admitted his involvement in an Ale House restaurant robbery in Doral. *Id.* at 6.

At 3:45 p.m., detectives interviewed Hanna regarding the Wendy's robbery. [D.E. 65-3].  Before asking him substantive questions, however, the detectives re-*Mirandized* Hanna, who again acknowledged and voluntarily waived his *Miranda* rights. *Id.* at 3-4. He then admitted to robbing the Wendy's with the co-defendants.   *Id.*  at 4-5. Additionally, he acknowledged that his statements were made voluntarily, without threats, coercion or improper promises.  *Id.* at 13.

Ransfer.   He provided several recorded interviews.   Prior to his first interview, Ransfer executed a written *Miranda* waiver at 5:40 a.m. [D.E. 66-1].   At 4:06 p.m., Ransfer provided a recorded statement about the Wendy's robbery. [D.E. 66-2].   During this interview, Ransfer reviewed, orally acknowledged and waived his *Miranda* rights. *Id.* at 3-4.   He then voluntarily admitted to being in the vehicle during the Wendy's robbery, but denied entering the restaurant. *Id.* at 4-5.   Additionally, he acknowledged

8

that his statements were made voluntarily, without threats, coercion or improper promises. *Id.* at 11. At 5:01 p.m., Ransfer was interviewed about a CVS robbery in Hialeah. [D.E. 66-3]. He was not re-*Mirandized* on the recording, but Ransfer voluntarily answered the questions and denied any involvement in this robbery. *Id.* at 9.

Thereafter, at approximately 7:55 p.m., Ransfer testified about a CVS robbery in Kendall, but declined to give a recorded statement. [D.E. 66-4] According to the supplemental report and the detectives' testimony, Ransfer reviewed, orally acknowledged and waived his *Miranda* rights, and then admitted his involvement in this robbery. *Id.* at 2-3; D.E. 100 at 144-148.[8]

Lastly, detectives interviewed Ransfer about a Farm Store robbery in Sweetwater. At 7:50 p.m., before the recorded interview began, Ransfer executed another written *Miranda* waiver. [D.E. 66-6]. He then voluntarily provided two statements, one at that time and then again at 11:01 p.m. During these interviews, Ransfer reviewed, orally acknowledged and waived his *Miranda* rights. [D.E. 66-5 at

---

[8]     The record evidence conflicts as to when this interview took place. The detective's supplemental report indicates that Ransfer acknowledged his *Miranda* waiver at 7:55 p.m. [66-4 at 2]. However, this directly conflicts with evidence that Ransfer executed his Sweetwater *Miranda* form at 7:50 p.m. and completed his Sweetwater recorded interview at 8:15 p.m. *See* [D.E. 66-6; D.E. 66-5 at 24]. However, the Court notes that the record fails to evince a nefarious reason for this discrepancy and acknowledges it may be a clerical or memory error as the Government's response indicates the interview took place at or about 5:45 p.m., which, if true, resolves the discrepancy. [D.E. 66 at 7]. Ransfer does not raise this issue in his motion.

17-18;[9] 66-7 at 2].  He then admitted his involvement in the robbery.  *Id.* at 12; 2-4.

Additionally, Ransfer acknowledged that his statements were made voluntarily,

without threats, coercion or improper promises. *Id.* at 18-19; 2.

Lowe.  He provided two recorded interviews.  At 7:41 p.m., without a written or

orally recorded *Miranda* waiver, the detectives interviewed Lowe about the Hialeah

CVS robbery. [D.E. 67-1].  He voluntarily answered their questions, but denied any

direct involvement. [D.E. 67-1 at 6-8; D.E. 100 at 261-262].[10]

Thereafter, Sweetwater detectives provided Lowe with a written *Miranda*

waiver, which he executed at 11:15 p.m. [D.E 67-3].  Lowe then voluntarily provided

detectives with a recorded statement about the Farm Store robbery. [D.E. 67-2].  After

reviewing, acknowledging and orally waiving his *Miranda* rights, Lowe repeatedly

denied any involvement in this robbery. *Id.* at 2-3; 3, 17, 24-25, 34.  Additionally, he

acknowledged that his statements were made voluntarily, without threats, coercion or

improper promises. *Id.* at 44-45.

Davis.  He provided several recorded interviews.  At 3:45 p.m., before his first

recorded interview, Davis executed a written *Miranda* waiver and provided an

unrecorded pre-interview about the Wendy's robbery. [D.E. 64-1] He then provided a

recorded interview that ended at 6:52 p.m. [D.E. 64-2 at 19].  Before answering any

---

[9]   Notably, however, the detective *Mirandized* Ransfer after he made an improper statement.  This issue is discussed in more detail below. *See* n. 17, *infra*.

[10]   During this interview, Lowe admitted to being on Davis' porch when the police arrived on June 1, 2011. [D.E. 67-1 at 11].

substantive questions, however, Davis reviewed, acknowledged and orally waived his *Miranda* rights on the record. *Id.* at 3. He then denied any involvement in the Wendy's robbery. *Id.* at 10.

At 7:11 p.m., detectives interview Davis about the Kendall CVS robbery. [D.E. 64-4]. Before answering substantive questions, Davis reviewed, orally acknowledged and waived his *Miranda* rights. *Id.* at 5-7. He then admitted his involvement in this robbery, but denied ownership of the firearms found at his residence. *Id.* at 15, 24. Additionally, he acknowledged that his statements were made voluntarily, without threats, coercion or improper promises. *Id.* at 26.

At 8:19 p.m., Davis provided a recorded statement about the Hialeah CVS robbery and admitted his involvement. [D.E. 64-6 at 11-15]. He denied, however, any involvement in additional Hialeah robberies that the detectives questioned him about. *Id.* at 18. The detectives do not re-*Mirandize* Davis on the record during this interview.[11]

At 8:58 p.m., detectives interviewed Davis about a Shell gas station robbery. [D.E. 64-7]. Before answering any substantive questions, Davis reviewed, orally acknowledged and waived his *Miranda* rights. *Id.* at 2-4. Davis then admitted his involvement in this robbery. *Id.* at 4-5, 8-9, 11. Additionally, he acknowledged that his

---

[11]     Detective Carvagal participated in this interview. [D.E. 100 at 4-12]. He acknowledged that Davis was not re-*Mirandized* because Davis had previously waived his *Miranda* rights. *Id.* at 8. He also acknowledged that Davis never requested to speak with an attorney. *Id.*

statements were made voluntarily, without threats, coercion or improper promises. *Id.* at 2-4, 10.

At 9:23 p.m., Davis was interviewed about the Doral Ale House robbery. [D.E. 64-8]. Again, before answering any substantive questions, Davis reviewed, orally acknowledged and waived his *Miranda* rights. *Id.* at 4-6. Davis then admitted his involvement in the robbery with a firearm. *Id.* at 10-16. Additionally, he acknowledged that his statements were made voluntarily, without threats, coercion or improper promises. *Id.* at 5-6, 16.

At 10:25 p.m., Davis executed a second *Miranda* waiver, and then provided a recorded statement about the Sweetwater Farm Store robbery. [D.E. 64-5, 64-9]. Again, before answering any substantive questions, Davis reviewed, orally acknowledged and waived his *Miranda* rights. *Id.* at 2-3. He then acknowledged that his statements were made voluntarily, without threats, coercion or improper promises. *Id.* But denied any involvement in this robbery. *Id.*

Notably, the recorded interviews indicate that the Defendants never asked the officers to cease questioning, sought an attorney or invoked any of their *Miranda* rights. Moreover, in several of the recorded statement, the Defendants admit they were offered food, drink and access to the restroom. In fact, apart from their in-court testimony to the contrary, the Defendants fail to present any credible, competent evidence that the detectives treated them inappropriately or otherwise violated their *Miranda* rights. Furthermore, during the evidentiary hearing, each testifying officer

corroborated that the Defendants were repeatedly *Mirandized*, both before and during their recorded statements. *See* [D.E. 99, 100].

### III.   ANALYSIS

### A.   <ins>The Warrantless Search of Davis' Residence Was Permissible</ins>

Defendant Davis contends that officers "made a warrantless entry in [his] residence and proceeded to search it" and, thus, the officers violated his Fourth Amendment rights. [D.E. 57 at 5]. The record, however, clearly demonstrates that the officers lawfully entered his residence to detain two fleeing suspects, Defendants Davis and Lowe.

Officers arrived at Davis' residence as a result of their investigation into the Wendy's robbery, which took place just hours before his arrest. As explained above, the officers had ample reason to believe that Davis and his robbery crew were responsible for the Wendy's robbery: 1) the robbery crew was previously identified; 2) several members were just arrested; 3) Davis was the suspected leader; 4) officers knew the location of Davis' residence; 5) a suspected getaway vehicle was located near Davis' residence; and, 6) Davis was positively identified on his front porch. Thus, as a preliminary matter, the officers had probable cause to arrest Davis at his residence. *See generally Beck v. Ohio*, 379 U.S. 89 (1964) (probable cause to arrest exists when law enforcement officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime).

Officers arrested Davis in his residence because, according to the Government, Davis fled and exigent circumstances warranted their pursuit. Davis argues, however, that there were no exigent circumstances because Davis and Lowe were inside the residence when police arrived. To support his position, Davis points to purportedly conflicting officer testimony, the contemporaneous radio transmission and Davis' 39-second 911 call.[12]

Davis agrees with the general description of events explained above, with a few notable exceptions. First, Davis argues that the officers provided conflicting testimony about his description. Indeed, arresting officer Det. Ramirez testified that he observed two suspects (Davis and Lowe) wearing dark clothes and hoodie sweatshirts, which matched the BOLO from that evening. *See* Government Ex. 54; [D.E. 99 at 229]. This, however, as noted above, conflicts with the testimony of Det. Thomas. [D.E. 100 at 35]. But, additional facts minimize the weight, if any, of this discrepancy. First, Det. Thomas testified that Davis (if not others) walked into his residence and then returned to the porch several minutes later. *Id.* at 37. Second, he observed one individual wearing all black clothing. And finally, he testified that he lost sight of the suspects at or before the time the arresting officers arrived on scene. *Id.*

Synthesizing the evidence, the Court concludes that their testimony substantially aligns. Det. Thomas previously interacted with Davis, so he was able to identify him regardless of his clothing. [D.E. 100 at 35-37]. With updated information,

---

[12]      The Government concedes that Lowe's cell phone was recovered from the residence and that a 911 call was placed at 11:58 p.m. [D.E. 105-2].

Det. Thomas informed the officers that the positively identified suspects wore either white shirts and dark pants or all dark clothes. Thus, the only notable discrepancy is that Det. Ramirez observed two suspects in dark sweatshirts, whereas Det. Thomas only testified to one. However, because Det. Thomas observed suspects entering and exiting the residence, and because he lost sight of them at some point, it is possible that a suspect replaced the sweatshirt during this period of time. Indeed, this possibility highlights the speculative nature of Davis' argument. Ultimately, the Court concludes this argument is largely irrelevant in light of two salient facts: 1) Det. Thomas positively identified the suspects on Davis' porch and 2) the on-scene officers credibly testified that the suspects were on the porch and fled upon the officers' arrival. *See* [D.E. 99 at 229-230, 283-284]. Thus, in light of these facts, the Court concludes that the purported discrepancy (to the extent one actually exists) is too attenuated and speculative to warrant material consideration.

Next, Davis argues that the contemporaneous radio transmission demonstrates that the officers were unable to locate Davis' residence and that, had Davis and Lowe been on the front porch, this would not have occurred. As Det. Thomas directed the officers, they had to turn east on Davis' street and continue four houses to reach his residence. Notably, after officers indicated that they had turned onto Davis' street, the radio transmission includes questions such as "... which house is it" and "this one right here with the cover on it?" made approximately 15 to 30 seconds later, respectively. [D.E. 105-1; Davis Ex. 6]. Davis argues that these questions indicate the officers were unable to find the residence, which would corroborate Davis' position that he was

inside at the time.  Moreover, Davis asserts that the greater lapse of time evinced by the radio transmission conflicts with the short distance the officers were required to travel and the in-court testimony that officers arrived at the residence quickly. [D.E. 99 at 284-285].  Davis contends that this longer elapsed period more accurately reflects reality and corresponds with his position that he and Lowe were inside.  To further support this argument, Davis contends that he was able to place a 39-second 911 call to report that officers were attempting to break into his home, which (he alleges) he could not have done had he been fleeing. [D.E. 110 at 10-12].[13]

However, again synthesizing the complete record, the Court disagrees with Davis' cherry-picked evidence and hyper-specific interpretation as too attenuated and speculative to warrant material consideration.  First, with respect to the radio transmission, the Court will not accept that this establishes the number of officers involved or accurately represents the complete universe of communication made during the arrest.  And while an officer may have radioed that "we're making the turn right now," this statement cannot establish that *all* of the officers turned at that moment.  Indeed, their unsynchronized arrival is corroborated by Detective Elio Garcia's testimony that he arrived last, after several officers were already on scene. [D.E. 99 at 283-284].[14]  Moreover, there is nothing in the record establishing that these officers

---

[13]      Technically, Davis testified that Lowe dialed and then handed him the phone.

[14]      Det. Garcia could not give a specific number, but testified at least four police vehicles, including his own, arrived on scene. *Id.*

who requested additional information were actually on Davis' street looking for the house, rather they may have been en route and simply asked for a repeated instruction or sought additional information. Again, the speculative nature of the argument and the lack of complete information limits the weight of Davis' argument.

Moreover, aligned with Davis' argument, Det. Ramirez unequivocally and credibly testified that he turned onto Davis' street, parked one house away and walked up to Davis' residence. [D.E. 99 at 229]. His testimony accords with the lapse of time on the radio transmission because it would have taken him more than several seconds to interact with the suspects. And by the time he was in place, the subsequently arriving vehicles could have identified his vehicle to locate the residence (to the extent it was difficult to locate). Likewise, because Det. Garcia testified to arriving last, and observed some vehicles parked directly in front while others were further way, his testimony also accords with testimony that Det. Ramirez parked his vehicle one house away. [D.E. 99 at 285]. To the extent Det. Garcia testified to arriving quickly, this fact is less significant because he arrived after others, such as Det. Ramirez's, were already in place.

With respect to the 911 call, Davis testified that he called 911 after observing officers converge on his residence. [D.E. 110 at 10]. Again, the Court finds this argument too speculative to warrant serious consideration. Davis neither presents credible evidence to establish that this call was placed from inside his residence nor provides the Court with evidence to establish the content (if any) of that phone call. Frankly, without more, the record evidence could equally support the possibility that

17

Davis called 911 while fleeing and dropped the phone, which an operator kept open for 39-seconds. Again, this highlights the Court's point; Davis' arguments are too speculative to overcome the Government's contrary evidence.

This conclusion is further bolstered by a time discrepancy that establishes the 911 call was placed *after* Davis was already in custody. According to the radio transmission, the Defendants were apprehended before 11:55 p.m. *See* [105-1 at 4 ("We got one that came inside. We had to go inside. They're taking him into custody right now")].[15] However, Davis did not purportedly dial 911 until 11:58 p.m., several minutes later. [D.E. 105-2 at 2]. While the Court acknowledges this fact is not dispositive by itself, it nevertheless supports the Government's version of events.

Finally, the weight the Court attributes to Davis' argument is directly related to his credibility. However, a complete review of the record demonstrates that Davis' version lacks credibility. For instance, while Davis contends he and Defendant Lowe were inside the residence, Defendant Lowe admits to standing on the porch when officers arrived. *Compare* [D.E. 110 at 10] *with* [D.E. 67-1 at 11]. Moreover, Davis' underlying rationale for calling 911 defies commonsense. He asserts that after observing police officers converging on his residence he called 911 to request *police*

---

[15]    The Court finds the officer's contemporaneous testimony that a suspect had fled into the home but was now in custody credible because accurate information during an arrest is necessary to ensure officer safety. Moreover, the Court rejects the notion that officers would purposefully create a false "exigency" record six months in advance in anticipation of a possible suppression hearing.

assistance.   Without more, the Court simply finds his testimony on this point unbelievable.

Ultimately, without providing any competent unbiased evidence to establish that Davis and Lowe were inside Davis' residence, the Court finds this argument uncompelling.   To the contrary, the Government's factual evidence sufficiently establishes that Davis and Lowe were standing on Davis' front porch when officers arrived on scene and, upon their arrival, Davis and Lowe fled into Davis' residence.

With these questions of fact resolved, the Court turns to the pending legal inquiry.   "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).   "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.1991) (en banc).   As noted above, the officers had probable cause to arrest Davis and Lowe.   The sole question is whether the circumstances were sufficiently "exigent" to justify the warrantless entry and search of his residence.   The Court concludes they were.

Although "[c]ourts have catalogued several situations in which exigent circumstances exist, ... it is clear that the exception must be applied carefully to each factual scenario." *United States v. Lynch,* 934 F.2d 1226, 1232 (11th Cir.1991) (citing *United States v. Blasco,* 702 F.2d 1315, 1325 (11th Cir.1983)).   "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and

'the burden is on those seeking [an] exemption [from the requirement] to show the need for it ....' " *Chimel v. California,* 395 U.S. 752, 762 (1969) (alterations and omissions in original) (quoting *United States v. Jeffers,* 342 U.S. 48, 51 (1951)).   Hence, the government bears the burden of proving exigent circumstances. *United States v. Holloway,* 290 F.3d 1331, 1337 (11th Cir. 2007).   The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos,* 720 F.2d 1520, 1526 (11th Cir.1983).  Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." *Blasco,* 702 F.2d at 1325.

While other exigencies may exist, the obvious and most readily applicable exigency is hot pursuit of a fleeing suspect.  In that context, recognized factors that an exigency exists include: "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public." *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987).

There is no question the facts presented squarely fit within this exigent exception and that the Government has carried its burden.  Indeed, the Supreme Court concluded over four decades ago that this exception would apply with less compelling facts. *See Warden v. Hayden*, 387 U.S. 294, 297-99 (1967) (exigent circumstances permitted warrantless search when an armed robbery suspect, believed to be armed, fled into a home).  Unlike *Warden*, officers here approached the residence, identified two armed robbery suspects and then personally observed them flee directly into the residence – a set of facts that clearly satisfies each *Standridge* factor.  Accordingly, the officers' pursuit of the suspects into the residence was permissible under the clear exigent circumstances. *See Warden*; *Standridge*; *United States v. Walker*, No. 09-20602-CR, 2009 WL 3872039, at *3-4 (S.D. Fla. Nov. 13, 2009) (officers were permitted to conduct a warrantless search of an apartment and conduct a protective security sweep after the defendant, suspected of armed robbery,  fled into the residence), *aff'd*, 438 F. App'x 776 (11th Cir. 2011)).

Therefore, the Court concludes that Defendant Davis' Fourth Amendment rights were not violated by the warrantless entry into the residence under the circumstances of this case.

### B.    *The Defendants Intelligently, Knowingly and Voluntarily Waived Their* Miranda *Rights*

Defendants contend that they were detained and interviewed for an impermissible period of time (approximately 24 hours), physically abused, deprived of the ability to sleep, denied food and water and denied the ability to use the restroom.

Consequently, each Defendant contends that they did not intelligently, knowingly and voluntarily waive their *Miranda* rights and, likewise, their inculpatory statements were a product of intimidation, coercion or deception.  The Government contends, however, that while the Defendants were interviewed for an extended period of time, the record otherwise demonstrates that they were treated fairly and voluntarily gave inculpatory statements after receiving and waiving their *Miranda* rights.

As a preliminary matter, the length of the Defendants' interviews (24 hours), by itself, will not render their statements the product of coercion or otherwise act to void their *Miranda* waivers.  Indeed, as *Gerstein* and *McLaughlin* explain, officers may hold a suspect for 48 hours without recourse and, even after 48 hours, custodial inculpatory statements remain admissible if the record sufficiently establishes the statement is made voluntarily, after *Miranda* warnings. *See Gerstein v. Pugh*, 420 U.S. 103 (1975) (Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-7  (1991) (Court held that, absent unreasonable delay, "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*"); *see also Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008) (Eleventh Circuit held that a confession made after the 48-hour period would not be suppressed because the confession was made voluntarily, post-*Miranda* warning).

22

Here, the Defendants were held for 24 hours, which is understandable considering the number of robberies implicated and jurisdictions involved. Moreover, on this record, the Defendants present no evidence that demonstrates there was an unnecessary delay before they were presented for a probable cause hearing. As such, the Court concludes that the duration of the interviews comport with *Gerstein* and *McLaughlin*.[16] That being said, the duration of an interview, combined with additional factors, such as lack of education, low intelligence, repeated or prolonged questions or physical punishment may have a cumulative effect resulting in a suspect involuntarily waiving his *Miranda* rights. *See United States v. Bernal-Benetiz*, 594 F.3d 1303, 1319 (11th Cir. 2010). As such, the Court turns to those additional factors to determine if such was the case here.

<u>Food, water, restroom</u>. During the evidentiary hearing, Hanna and Ransfer admitted to either eating or being offered food. [D.E. 100 at 196, 197 (Hanna); D.E. 110 at 113, 135 (Ransfer)]. Detective Eduarte credibly testified to purchasing McDonald's (corroborated by the receipt, *see* Government Ex. 36) and offering this food to each Defendant. [D.E. 99 at 142]. Other detectives testified to seeing this food, along with

---

[16]     Derivatively, Davis and Hanna argue that law enforcement violated 18 U.S.C. § 3501(c) by unnecessarily delaying their presentment to a federal magistrate judge within the six-hour safe harbor period. However, as the Government correctly notes, 18 U.S.C. § 3501(c) is inapplicable because the Government indicted them under the Hobbs Act on September 29, 2011, several months after their state arrest. [D.E. 3]. Simply put, this statute only imposes "a duty to present a person to a federal magistrate [after] the person has been arrested for a *federal* offense." *United State v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) (emphasis in original); *see also U.S. v. Fontane-Medina*, No. 11–20492–CR, 2011 WL 6826811, at *16 (S.D. Fla. Nov. 27, 2011). Accordingly, the Court dismisses this argument wholesale.

pizza and donuts offered to the Defendants. *See, e.g.,* [D.E. 99 at 272; D.E. 100 at 6, 316].

Notwithstanding this testimony, Davis adamantly denied receiving food. [D.E. 110 at 24, 86]. His testimony, however, is directly contrary to several detectives who specifically testified to offering Davis food or observing food that was made available to him. [D.E. 99 at 143, 197, 270; D.E. 100 at 213, 235]. This also applies to Lowe. [D.E. 99 at 111-114, 129-130, 142, 270]. In light of this testimony, and because neither Davis nor Lowe present any competent, credible evidence to support their position, the Court rejects this argument and concludes that the Defendants, as Hanna, Ransfer and every detective testified, were offered food and drink while in custody.

The Court reaches the same conclusion on the restroom issue. Again, Hanna and Ransfer admitted to using or being offered to use the restroom. [D.E. 100 at 197 (Hanna); D.E. 99 at 298; D.E. 110 at 135 (Ransfer)]. While Davis again denied this, [D.E. 110 at 24], the consistent and credible detective testimony (again, bolstered by his co-defendants' testimony) belie his assertions. [D.E. 100 at 214, 235]. As for Lowe, because he offered no competent testimony otherwise, the Court accepts the detectives' credible testimony that Lowe was also offered the opportunity to use the restroom during his interviews. [D.E. 99 at 108, 110, 129-130].

These conclusions are further corroborated by the Defendants' recorded statements. *See* II.B., *supra.*

Physical abuse, coercion. Defendants argue that their inculpatory statements were a product of physical abuse, coercion or both. *See, e.g.,* [D.E. 110 at 23-24, 40-43

(Davis); D.E. 110 at 108-112, 137-138 (Ransfer); D.E. 100 at 184-185 (Hanna); D.E. 62, 106 (Lowe)]. This argument, however, is belied by a substantial record to the contrary. First, each detective who testified stated otherwise. [D.E. 99, 100]. Second, each Defendant provided recorded interviews which stated otherwise. *See* II.B., *supra*. And finally, the Defendants fail to provide any unbiased or competent evidence to support this argument, i.e., evidence of physical abuse. For example, Davis testified that he was "punch[ed]" "hard" by as many as "10" officers about the "head" and face with closed-fists throughout the day. [D.E. 110 at 42-43]. However, there is no physical evidence whatsoever to support this extreme treatment. As such, the Court finds Davis' in-court testimony, much like that of his co-defendants, unbelievable on this point.

With that in mind, the remaining inquiry is whether the Government has established that the Defendants intelligently, knowingly and voluntarily waived their *Miranda* rights. *See Taque v. Louisiana*, 444 U.S. 469, 470 (1980). In determining whether a confession is voluntary, the Court must assess the totality of all of the surrounding circumstances including the characteristics of the accused and the details of any interviews/interview. The Court should focus on whether there was any police overreaching involved in any of the interviews. The factors the Court should look to include the Defendants' lack of education, lack of any advice concerning his constitutional rights, the length of detention, repeated or prolonged questioning and the use of any physical punishment such as deprivation of food or sleep. *Dickerson v.*

*United States*, 530 U.S. 428, 120 (2000); *Bernal-Benetiz*, 594 F.3d at 1319 (11th Cir. 2010); *Waldrop v. Jones*, 77 F.3d 1308 (11th Cir.1996).

The record evidence establishes that each Defendant was provided food, water and access to the restroom. The Defendants received *Miranda* instructions, indicated that they understood their rights and signed as many as two *Miranda* waivers each. The Defendants then provided recorded and un-recorded interviews to detectives, oftentimes with additional *Miranda* warnings, and voluntarily made various inculpatory and exculpatory statements. Thereafter, each Defendant, oftentimes more than once, acknowledged that their statements were made without coercion, threats, or improper promises. The Defendants present no competent evidence to the contrary.[17] Accordingly, without any compelling evidence otherwise the Court concludes that the Defendants' inculpatory statements were made after they each

---

[17] The Court notes one area of concern relating to Defendant Ransfer. During questioning, a Sweetwater detective told Ransfer that his cooperating statements would not be used against him. [D.E. 66-5 at 17]. This was improper. *See United States v. Mercer*, 541 F.3d 1070, 1075 (11th Cir. 2008) (a statement is not voluntary if it is obtained by any direct or implied promises, however slight). However, the detective's statement was immediately clarified and cured by re-*Mirandizing* Ransfer. [D.E. 66-5 at 17-18]. "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinary should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Oregon v. Elstand*, 470 U.S. 298, 313 (1985). Indeed, the record evidence establishes that Ransfer previously executed two *Miranda* waivers, acknowledged his *Miranda* waiver in a previously recorded statement, had given two voluntary statements that day already and, after a curing *Miranda* instruction, acknowledged that he knew his statements could be used "in court" and confirmed the detectives did not make him any promises in exchange for his statement. [D.E. 66-5 at 19]. As such, Ransfer fails to demonstrate that his statement was the product of the detective's improper statement.

intelligently, knowingly and voluntarily waived their *Miranda* rights. *See, e.g., United States v. Sharma*, No. 6:09-CR-1-ORL-19GRJ, 2009 WL 152868, at *8-10 (M.D. Fla. Jan. 21, 2009) (court denied motion to suppress statements because there was "no evidence" that the defendants were "deprived of food, sleep or any necessities over the course of any of the interviews" or that the defendants were "yelled at" or "threatened ... with physical harm."); *United States v. Anderson*, No. 07-14030-CR, 2007 WL 1970856, at *13 (S.D. Fla. July 3, 2007) (denying motion to suppress because defendant failed to present any evidence that his confession was a product of coercion (i.e. deprivation of food, drink, or sleep) and thus involuntary).

## IV.  CONCLUSION

Based on the totality of the circumstances, law enforcement had probable cause and exigent circumstances to enter Davis' residence, apprehend Defendants Davis and Lowe and conduct a protective sweep.  Additionally, the detectives' interviews comported with the protections afforded by the Fifth Amendment, *Miranda*, and its progeny.  Accordingly, the Defendants' motions to suppress [D.E. 57, 58, 59 and 62] should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until **January 20, 2012** to serve and file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  The Court finds good cause to expedite the objection period in light of the imminent trial date.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained

herein, if any. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993);

*LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404,

410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

      **DONE AND SUBMITTED** in Chambers at Miami, Florida this 17th day of

January, 2012.

                                    */s/ Edwin G. Torres*
                                EDWIN G. TORRES
                                United States Magistrate Judge